IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CHRISTOPHER ROSS,

Plaintiff,

v.

OPINION AND ORDER

20-cv-224-wmc

CYNTHIA RADTKE, CHARLES YORK, CHRYSTAL MELI,[1] DONNA LARSON, ANTHONY MELI, RYAN KUEPPER, TORRIA VAN BUREN, ETHAN STARK, and ANGELA KROLL,

Defendants.

---

Representing himself while incarcerated by the Wisconsin Department of Corrections ("DOC"), plaintiff Christopher Ross was granted leave to proceed with a claim that prison officials at Waupun Correctional Institution violated his Eighth Amendment rights by denying him access to a small desk-top mirror to insert a specialty contact lens prescribed to treat a medical condition known as keratoconus, which causes blurred vision and sensitivity to light. (Dkt. #21, at 5 ¶ 3(a).) The defendants are Security Director Anthony Meli, Captain Cynthia Radtke, Sergeant Charles York, and members of the Special Needs Committee at Waupun, including Chrystal Meli, Ryan Kuepper, Dr. Toria Van Buren, Ethan Stark, Donna Larson, and Angela Kroll. Defendants have moved for summary judgment, arguing that plaintiff's Eighth Amendment claim fails as a matter of law and, alternatively, that defendants are entitled to qualified immunity. For the reasons explained below, the court will grant defendants' motion and close this case.

[1] Chrystal Meli's former name was Chrystal Marchant. (Dkt. #32, at 1 n.1.)

## UNDISPUTED FACTS[2]

### A. The Parties

Plaintiff Christopher Ross is currently confined at Racine Correctional Institution. (Dkt. #9.) At all times relevant to the complaint, however, Ross was incarcerated at Waupun Correctional Institution ("Waupun"), where the defendants were all employed as correctional officers or health care providers.

On the corrections side, Anthony Meli ("A. Meli") was employed as Waupun's Security Director, where he administered and supervised the institution's security program. York was employed as a Property Sergeant; Radtke was employed as a supervisory officer with the rank of Captain; Kuepper was a Corrections Program Supervisor responsible for coordination and supervision of special programs for the institution; and Stark was a social worker. On the health care side, Van Buren was a Psychological Supervisor, overseeing the overall administration and supervision of the Psychological Services Unit; Chrystal Meli ("C. Meli") was employed as a Nursing Supervisor/Health Services Manager ("HSM"); and Kroll was a "Program Assistant – Confidential," providing program and clerical support to various supervisors, social workers, psychologists, and segregation staff. Finally, Larson

[2] Unless otherwise indicated, the following facts are drawn from the parties' proposed findings of fact in compliance with the court's procedures on summary judgment, which were provided during the preliminary pretrial conference. (Preliminary Pretrial Packet (dkt. #25) Proc. to be Followed on Mot. For Summ. Judg., §§ I-II.) Defendants fairly point out that many of plaintiff's proposed findings of fact are argumentative, conclusory, or cite to no evidence, and those objections are upheld. *See Hedrich v. Bd. of Regents of Univ. of Wis. Sys.*, 274 F.3d 1174, 1178 (7th Cir. 2011) (courts are to consider only evidence set forth in proposed finding of fact with proper citation); *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) (disregarding "submissions that make legal arguments and assert legal conclusions"). To the extent that plaintiff has not put into dispute the facts proposed by defendants -- by submission of contrary evidence or a challenge to the sufficiency of defendants' evidence -- the court treats those facts as undisputed. *See Hedrich*, 274 F.3d at 1178.

was employed as a Nurse Clinician 4, providing care for patients with complex needs and serving as a member of a multidisciplinary team within the institution in assessing, planning, implementing, and evaluating patient care.

**B. Initial Request for a Mirror**

Ross has a history of keratoconus in his right eye, for which he wore a specialty contact lens.[3] In 2012, Ross also received a corneal transplant in that same eye. On October 3, 2016, Ross had an offsite appointment with Dr. Richard Patterson, who is a specialist in ophthalmology. During that appointment, Ross reported that: his left eye got weak sometimes; he felt fatigued and had headaches; and that both of his eyes were sensitive to light. Dr. Patterson further noted that Ross's current eyeglasses were "under-corrected" for his right eye, after which he was fitted for a new specialty contact lens for his right eye.

On April 3, 2017, Ross returned to see Dr. Patterson to update his specialty contact lens due to issues with poor comfort and fitting. Until a replacement lens arrived at Waupun, Ross was advised to wear the lens he had. Sometime after this April 3 appointment with Dr. Patterson, Ross also asked a physician at Waupun, Dr. Jeffrey Manlove, to approve the purchase of a small, portable mirror to help with insertion of his specialty contact lens. Dr. Manlove, who does not have any specialized training in optometry or ophthalmology, wrote a "prescriber's order" for a small mirror at Ross's

[3] "Keratoconus" is "[a] conic protrusion of the cornea caused by thinning of the stroma," which is connective tissue between the iris and retina. *Stedman's Medical Dictionary* 1024, 1850 (28th ed. 2006). This condition causes nearsighted vision and astigmatism, which can lead to blurry vision. (Lee Decl. Ex. 1004 (dkt. #58-1), at 151.)

request on May 25, 2017, although for reasons he does not recall, discontinued that order shortly thereafter on July 21, 2017.

Dr. Manlove, who is not a defendant in this case, does recall writing the prescriber's order on May 25, 2017, after considering "offsite notes" from an optometry specialist regarding Ross's prescription contact lens. Further, when he did so, Dr. Manlove did not know for certain -- and did not consider -- whether such a mirror was allowed at Waupun, because that would be an issue to be determined by relevant security policies of which he was not specifically aware. Thus, as Dr. Manlove acknowledges, his medical orders were not the "final authority" to determine whether Ross was allowed to possess a portable mirror in light of other personal property restrictions or security policies in place at Waupun.

Eventually, Security Director A. Meli reviewed Dr. Manlove's May 25 prescriber's order and denied Ross's request to purchase the mirror. Although A. Meli does not recall specifically doing so, he explains that the denial would have been made for security reasons in compliance with existing policies that regulated inmates' possession of personal property at Waupun.

### C. Security at Waupun

Waupun is a maximum-security prison facility that houses many "high-risk offenders," including those convicted of serious violent crimes, such as homicide. As a result of its prisoner population, security staff at Waupun are required to closely monitor inmate conduct, behavior, and activities. Security supervisors at Waupun play a crucial role in ensuring the security and personal safety of every inmate and staff member at that

institution. Decision-making by security supervisors almost always requires consideration and identification of any potential danger or threats to the security of the institution. Because a minor infraction has the potential of leading to a chain of security threats, and because it was not uncommon for security supervisors to deal with manipulative behaviors in their day-to-day tasks, they must balance their decisions about individual prisoners and the safety of the larger community within the facility, including requiring compliance with existing policies.

The DOC Division of Adult Institutions ("DAI") has a policy in place that regulates inmates' possession of personal property. Specifically, DAI Policy #309.20.03 prohibits inmates from possessing portable mirrors at the following maximum-security facilities in Wisconsin: Columbia Correctional Institution, Green Bay Correctional Institution, and Waupun. (Born Decl. Ex. 1008 (dkt. #59-3), at 41.) There is an exception for mirrors that are considered "religious property," which is reserved for inmates who are Pagan.[4] (*Id.*) Where an inmate submits a personal property request for a mirror under this religious exception, the request would go to the unit chaplain for approval, but actual possession of such a mirror would still be subject to security precautions.

Captain Radtke, who started working as a correctional officer at Waupun in 1993, was employed as a supervising security officer at that facility from 2012, until she

[4] Pagans who practice the Wiccan faith use mirrors and other reflective surfaces as a divination tool for "scrying." *See Gelford v. Frank*, 310 F. App'x 887, 888 (7th Cir. 2008) (reviewing dismissal of a suit by Wisconsin state prisoners who were denied divination tools, including "scrying mirrors," to practice their Wiccan faith). "Scrying" is an occult practice that "consists of using a reflective surface or translucent body that allows the individual to perceive the past, present or future in aid of what she or he believes are psychic abilities (clairvoyance or precognition for example)." Christine A. Corcos, *The Scrying Game: The First Amendment, The Rise of Spiritualism, and State Prohibition and Regulation of the Crafty Sciences, 1848-1944*, 38 Whittier L. Rev. 59, 59 n.1 (2017).

transferred to another correctional institution in 2020. Captain Radtke states that, based on her knowledge and experience, compliance with the DAI policies on personal property was important to maintain institutional safety and security and to prevent introduction of contraband into the facility. Especially in the setting of a maximum-security environment, mirrors are among the personal items that pose higher security concerns because those institutions have many offenders with a history of assaultive conduct and/or mental health issues. Generally, mirrors could be snapped and turned into sharp objects by an inmate for purposes of self-harm or assaulting other individuals, including both security staff and other inmates.

From Captain Radtke's personal experience and perspective as a security supervisor, portable mirrors are among the personal items that pose higher risks of security threats. Even when they are advertised as "unbreakable," mirrors still have the potential of being snapped into smaller pieces to be used for self-harm or hurting other individuals within the facility. In maximum-security institutions like Waupun, possession of a portable mirror poses a particularly heightened risk becase many offenders have prior convictions for homicide and other serious violent crimes. Just as an example, inmates may stick a portable mirror out of their cells to observe movements of security officers or other inmates, pausing or planning illegal activities accordingly. Similarly, personal safety of security staff may be at risk if inmates are able use portable mirrors to observe staff movements.

In contrast, all inmates housed in the general population at Waupun, including plaintiff Ross, have a wall mirror in their cells, which are secured to a cell wall and cannot be removed without force. Moreover, unlike portable mirrors, wall mirrors are more difficult to break, posing less of a safety concern.

**D. February 2019 Request for a Mirror**

On February 2, 2019, Ross submitted an Interview/Information Request, seeking approval to purchase a small mirror. Ross complained that he had been approved to purchase a mirror from the "canteen," but his request had been denied by "the property room." (Lee Decl. Ex. 1004 (dkt. #58-1), at 207.) Nurse Jensen responded that she spoke to Captain Olson, who was going to contact Property Sergeant York, and noting that the purchase would not be from the canteen but from another vendor, advising Ross to wait a week for a response.[5] (*Id.*) Two weeks later, on February 17, Ross followed up with another Interview/Information Request, asking Nurse Jensen to investigate since he had not heard anything "from property." (*Id.* at 206.)

In response to Ross's February 17 Interview/Information Request, Nurse Jensen advised him that the request to purchase a mirror had been denied, not by Sergeant York, but by Captain Radtke. (Lee Decl. Ex. 1004 (dkt. 58-1), at 206.) Specifically, Nurse Jensen stated, "[Captain Radtke] denied it because there [was] a mirror in the cell." (*Id.*) Also documented on the form is a notation that Ross had "no current order from [a] provider" for a mirror. (*Id.*)

At that time, Ross's medical records contained a Medical Restrictions/Special Needs form completed by Nurse Gwendolyn Vick, indicating that Ross could purchase a mirror from the canteen to apply his contact lens. (Lee Decl. Ex. 1004 (dkt. #58-1), at 49.) That form was completed by Nurse Vick in September 2017, after Dr. Manlove had issued his

[5] Plaintiff named Nurse Jensen and Captain Olson as defendants previously, but his claims against them were dismissed at the screening stage for failure to allege a viable claim against them. (Dkt. #21.)

prescriber's order approving a mirror, although that order was withdrawn shortly after it was written and had expired. (*Id*.) There was another Medical Restrictions/Special Needs form signed by APNP Mary Moore in August 2019, also stating that Ross could purchase a mirror from the canteen to apply his contact lens. (*Id*. at 157.) Although this type of form (the DOC-3332B form) could be used to document property approved by the Special Needs Committee, it could also be used to record a medical restriction imposed pursuant to a physican's order. (Larson Decl. (dkt. #63), at ¶ 18; Born Decl. Ex. 1007 (dkt. #59-2), at 2-4.) To be valid in either context, however, an unexpired medical order or a clear indication of medical necessity was required to exist in the inmate's medical records, and Ross's records contained neither. (*Id*.)

Radtke does not recall seeing the Medical Restrictions/Special Needs forms and did not have access to Ross's medical records, nor was she aware of any medical necessity requiring the use of a portable mirror for the insertion of a specialty contact lens. According to both Radtke and A. Meli, security staff do not have authority to make exceptions to the prison property policy, but inmates who seek an exception for items that are deemed medically necessary can submit a request for consideration by the unit Special Needs Committee.

**E. The Special Needs Committee**

The Special Needs Committee (the "SNC") at Waupun is tasked with determining whether an inmate requires a restriction or special need based upon a showing of medical necessity (for example, a low bunk assignment). The SNC is a multi-disciplinary committee comprised of one or more staff representatives from the Health Services Unit

("HSU"), as well as security and non-security staff representatives within the institution. The SNC members review inmates' special needs requests and make recommendations based on their respective roles. When an inmate's medical condition is relevant to the assessment of his special needs request, members from the HSU provide the inmate's medical information for other members to consider. The HSU representatives on the committee review the inmate's relevant medical records to see whether a "clear medical necessity" had been identified for the item or action that was requested. HSU representatives then reach a decision on the inmate's request, by consensus with the other members in the SNC.

When reviewing inmates' requests for exceptions to other prison policies, the SNC has specific rules that they must follow, including the policy on personal property. Specifically, SNC members are required to follow the "Health Services Policy and Procedures" found in DAI Policy #300:07 to determine whether an inmate required medical restrictions or equipment based on special medical or dental needs. (Born Decl. Ex. 1007 (dkt. #59-2), at 1.) Under DAI Policy #300:07, "[a] significant medical/dental condition which clearly indicates that a restriction/special need is medically necessary must exist for health services to get involved." (*Id*. at 2.) According to Nurse Larson, a clear indication of medical necessity from a professional specialist in the relevant field is important in making this determination due to the fact that HSU representatives on the committee may not have received specialized training in every medical subject. Also important is whether the medical indication come from a doctor who had assessed or examined the inmate's condition in person. Therefore, the SNC members rely on the notes and statements from specialists in the requesting inmate's medical records. In situations

where the records do not make a clear indication of medical necessity, HSU representatives and the SNC members do not assume that one existed.

Finally, SNC members are required by DAI Policy #300:07 to consider "[t]he security level and physical environment of the facility . . . when authorizing special needs/restrictions." (Born Decl. Ex. 1007 (dkt. 59-2), at 2.) Thus, the SNC does not have unlimited authority to approve exceptions that are in conflict with the institution's security policies. (*Id.*) Likewise, inmates would not be given special approval to purchase medical appliances or other items that were not already approved through the DOC property policy, and "[m]edical/dental approval was not a way to circumvent the property rules." (*Id.*)

### F. April 2019 Special Needs Request

After Captain Radtke denied Ross's request to purchase a mirror in February 2019, Ross was seen by Dr. Patterson for an offsite appointment on March 20, 2019. (Lee Decl. Ex. 1004 (dkt. 58-1), at 111.) Dr. Patterson noted that Ross continued to need a specialty contact lens for the keratoconus in his right eye, and while Ross had "possible" keratoconus in his left eye, he was able to "achieve good vision with glasses," which Dr. Patterson updated. (*Id.*) Dr. Patterson added that insertion and removal of the specialty contact lens for Ross's right eye required a mirror, "preferably 'desk top' size" to allow Ross to sit while handling his contact lens. (*Id.*) Dr. Patterson asked prison officials to provide Ross with such a mirror, "if at all possible." (*Id.*)

On April 12, 2019, Ross submitted an Interview/Information Request asking officials to review the records from his latest appointment with Dr. Patterson, who

recommended the use of a desk-top mirror. (*Id*. at 198.) Nurse Larson responded that despite this recommendation by an offsite specialist, it was up to his provider at the unit to enter orders consistent with DOC policy and procedures. (*Id*.) Larson noted further that Ross could stand and use the mirror on the wall of his cell. (*Id*.) Subsequently, Ross submitted another request to HSU staff for a desk mirror and a low-bunk restriction for spinal issues, which was referred to the SNC. (*Id*. at 201.)

Ross's request was considered during a meeting of the SNC that occurred on April 18, 2019. Although defendants Kuepper, Stark, and Van Buren were listed on the meeting record as among the SNC members that day (Born Decl. Ex. 1006 (dkt. #59-1), at 1), it is undisputed that Van Buren had not served on the SNC since February 4, 2018, and was not present. An SNC memorandum shows that Ross's special needs request for a desk mirror was denied at this meeting because there was "no medical indication" of necessity and the request did not meet the DAI Policy #300:07 criteria. (Lee Decl. Ex. 1004 (dkt. #58-1), at 197.) However, Ross's request for a low bunk assignment was approved. (*Id*.)

### G. May 2019 Special Needs Request

Subsequently, Ross submitted another special needs request for a desk-top mirror, which was considered by the SNC during a meeting that took place on May 2, 2019. (Lee Decl. (dkt. #58-1), at 193.) Defendants Kuepper, C. Meli, Kroll, Stark, and Larson were documented in the meeting record as SNC members in attendance that day. (Born Decl. Ex. 1006 (dkt. #59-1), at 2.) To the best of her recollection, Nurse Larson reviewed Ross's medical records and found no clear indication of medical necessity for a desk-top mirror. In particular, although Dr. Patterson's notes state that a desk-top mirror was "preferrable,"

Larson explains this was not a clear indication that the requested item was a "medical necessity." In her experience while working at Waupun and in the medical field generally, Larson adds that it was not uncommon for medical prescribers to write medical orders for a certain item solely based on an inmate's request without actual support or a clear indication of a medical need. Therefore, medical orders including a "preference" did not control whether an item would be issued to an inmate, especially with many other institutional policies that staff in different departments must follow in their respective roles.

OPINION

Defendants have moved for summary judgment on plaintiff's Eighth Amendment claim. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive summary judgment, however, the nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to [reach] a verdict in [his] favor." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (citation and internal quotation marks omitted).

Although *pro se* litigants are entitled to liberal construction of their pleadings, they, too, have the burden to come forward in response to a motion for summary judgment with evidence that demonstrates a genuine issue of material fact. *Arnett v. Webster*, 658 F.3d

742, 760 (7th Cir. 2011) ("[A plaintiff's] *pro se* status doesn't alleviate his burden on summary judgment.") (citation omitted). Further, while the court views the record "in the light most favorable to the nonmovant and constru[es] all reasonable inferences from the evidence in his favor," *Moore v. Western Ill. Corr. Ctr.*, 89 F.4th 582, 590 (7th Cir. 2023), a nonmovant is only entitled to favorable inferences that are supported by admissible evidence, not those based upon mere speculation or conjecture, *Grant v. Trustees of Ind. Univ*., 870 F.3d 562, 568 (7th Cir. 2017), or upon "[c]onclusory statements, not grounded in specific facts," *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016).

## I. Eighth Amendment Claim

The Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners" that amounts to "the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To succeed on a claim of constitutionally inadequate medical care, an inmate "must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc*., 839 F.3d 658, 662 (7th Cir. 2016)). A medical need is objectively serious if it "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Donald v. Wexford Health Sources*, Inc., 982 F.3d 451, 458 (7th Cir. 2020) (citations and internal quotations omitted). A prison official acts with the requisite deliberate indifference only if the official "*actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728

(7th Cir. 2016) (emphasis in original) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *see also Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (same). Deliberate indifference is "a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)).

Plaintiff was granted leave to proceed with an Eighth Amendment claim that defendants denied him adequate medical care in rejecting his requests for a portable desk-top mirror, which he maintains was necessary to insert his specialty contact lens into his right eye.[6] In support, plaintiff points to (1) instructions from the manufacturer of his specialty contact lens, which recommends the use of a "simple small mirror which could be laid flat on a hard surface" while inserting the lens (dkt. #18, at 2); and (2) Dr. Patterson's recommendation that he be allowed to purchase such a mirror to help with the proper insertion of his specialty contact lens. (*Id*. at 2-3.) Because plaintiff's request for an accommodation was presented to the individual defendants at difference times and in difference capacities, the court will address them separately.

### A. Sergeant York and Dr. Van Buren

To be held liable for a constitutional violation under 42 U.S.C. § 1983, a defendant must have been personally involved in the alleged violation. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018); *see also Gonzalez v. McHenry Cnty., Ill.*, 40 F.4th 824, 828 (7th

[6] Plaintiff was also granted leave to proceed with a second claim that he was denied medical care by defendants C. Meli and Nurse Larson for pain and suffering associated with being unable to insert his specialty contact lenses without the small mirror he requested. (Dkt. #21.) That claim was dismissed previously for failure to exhaust administrative remedies. (Dkt. #54.)

Cir. 2022) (Section 1983 lawsuits "require personal involvement in the alleged constitutional deprivation to support a viable claim."). Defendants have presented uncontroverted evidence that Sergeant York had *no* involvement in the decision to deny plaintiff's request for a portable desk-top mirror in February 2019, and that York otherwise had no authority to grant that request. (York Decl. (dkt. #62) ¶ 5.) Likewise, defendants present uncontroverted evidence that Dr. Van Buren was not a member of the SNC during the time period that plaintiff's requests were considered by that committee. (Van Buren Decl. (dkt. #65) ¶ 7.)

Thus, defendants York and Van Buren argue that they are entitled to summary judgment because there is no evidence showing they were personally involved in any decision to deny plaintiff's requests for a desk-top mirror. (Dkt. #56, at 11.) Plaintiff having presented no evidence showing that either defendant Van Buren or York had the requisite personal involvement in the alleged violation of his rights. Absent such a showing, no reasonable jury could find that Van Buren or York violated plaintiff's rights. Therefore, these defendants are entitled to summary judgment.

**B. Security Director A. Meli and Captain Radtke**

Defendants A. Meli and Radtke argue that plaintiff has offered no evidence that they acted with deliberate indifference when they denied plaintiff's request for a small mirror under the prison policy that restricted possession of such items for reasons of safety and security. (Dkt. #56, at 13.) Indeed, as security supervisors, neither A. Meli nor Radtke had access to plaintiff's medical records. (A. Meli Decl. (dkt. #64) ¶ 10; Radtke Decl. (dkt. #66) ¶ 17.) Moreover, even if they would have had access to plaintiff's medical

records, the requested accommodation violated DAI policy for security reasons prohibiting inmates from possessing hand-held mirrors in maximum security facilities such as Waupun, where many inmates have a history of violent behavior. (A. Meli Decl. (dkt. #64) ¶ 11; Radtke Decl. (dkt. #66) ¶¶ 7-9.) Neither A. Meli nor Radtke had authority to make exceptions or change this policy. (A. Meli Decl. (dkt. #64) ¶ 9; Radtke Decl. (dkt. #66) ¶ 8.) Instead, requested personal property violating security policy would have to satisfy proof of medical necessity after submission to the SNC for approval of the item. (A. Meli Decl. (dkt. #64) ¶ 8; Radtke Decl. (dkt. #66) ¶ 12.) Here, the SNC considered but did not approve plaintiff's requests for a desk-top mirror.

Courts have long recognized the need to balance security and medical concerns "when the safety and security of other prisoners, staff, administrative personnel, and visitors is at issue," while differentiating certain medical needs for "surgery or medication [which] does not ordinarily impact prison security." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 764 (7th Cir. 2021) (citing *Whitley v. Albers*, 475 U.S. 312 (1986)). When balancing those needs in Eighth Amendment deliberate-indifference cases, courts also emphasize that a defendant must "actually know about yet disregard a substantial risk of harm to an inmate's health or safety." *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (citation omitted).

In this case, plaintiff does not dispute that he had a mirror that was affixed to the wall of his cell and he further does not contest that the portable desk-top mirror he requested could easily be turned into an assaultive weapon or a tool for self-harm. Likewise, plaintiff does not dispute that without access to his medical records or a clear indication of medical necessity from the SNC, neither A. Meli nor Radtke were aware of, much less

disregarded, a substantial risk of harm to his health or safety. Finally, weighing the balance between medical necessity and security was never defendants Meli's and Radtke's responsibility, but rather for medical staff. Because no reasonable jury could find that Security Director Meli or Captain Radtke denied plaintiff's request for a desk-top mirror with deliberate indifference to his medical needs, these defendants are entitled to summary judgment on the claims against them as well.

### C. HSU Manager Kroll, Program Supervisor Kuepper, Nurse Larson, Nursing Supervisor C. Meli, and Social Worker Stark

As set forth previously, defendants Kroll, Kuepper, Larson, C. Meli, and Stark served on the SNC that denied plaintiff's special needs requests for a desk-top mirror on April 18 and May 2, 2019, because there was *no* indication that a desk-top mirror was medically necessary and they further did not meet the criteria found in DAI Policy #300:07. (Ex. 1004 (dkt. #58-1), at 158, 197.)

To begin, plaintiff does not dispute that DAI Policy #300:07 requires a finding of medical necessity before health services at the institution could override denial of a prohibited item to an inmate. In this case, plaintiff fails to offer evidence from which a reasonable jury could find that a desk-top mirror was medically necessary, much less that a treating physician had said so.

As noted, in support of this claim, plaintiff points to instructions from the manufacturer of his specialty contact lens, which state only that "[*s*]*ometimes* it's helpful to place a mirror flat on the counter to look into" when inserting a lens. (Dkt. #1-2, at 1 (emphasis added).) Plaintiff also points to the notes from Dr. Patterson, who indicated in

March 2019, that plaintiff "require[d] a mirror, *preferably* 'desk top' size," to allow plaintiff to sit while inserting his lens. (Lee Decl. Ex. 1004 (dkt. #58-1), at 111.) However, as Nurse Larson explains, a physician's use of the terms "preferable" or "preferably" in recommending a certain items is *not* a clear indication of medical necessity. Thus, plaintiff's claim boils down to a disagreement between the SNC's decision that a desk-top mirror was not medically based on the records before it, and Dr. Patterson's recommendation that such a mirror was "preferable."

Even viewing this evidence in plaintiff's favor as non-movant, Dr. Patterson's expression of preference stopped short of saying that a desk-top mirror was medically required or even providing specific reasons that a small desk-top mirror was "clearly" indicated or required as a medical necessity, particularly when it is undisputed that plaintiff had a wall mirror affixed to his cell.

Further, to the extent that HSU representatives on the SNC disagreed with Dr. Patterson's assessment that a desk-top mirror was "preferable" as opposed to medically necessary or required, the fact that another medical provider has reached a different conclusion about what treatment was indicated is not, on its own, sufficient evidence for a reasonable jury to find deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Wilson v. Adams*, 901 F.3d 816, 822 (7th Cir. 2018). Based on this record, therefore, defendants Kroll, Kuepper, Larson, C. Meli, and Stark are also entitled to summary judgment.

## II. Qualified Immunity

Defendants argue further that they are entitled to qualified immunity from liability because plaintiff cannot show that denying an inmate a small, portable mirror in a maximum-security facility violated a clearly established constitutional right, at least where a wall mirror was available in his cell. (Dkt. #56, at 16-17.) Qualified immunity protects government officials from liability for damages unless they "violate clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once the defense is raised, the plaintiff bears the burden of defeating it by showing that: (1) the defendants violated a constitutional right; and (2) the constitutional right was clearly established at the time of the violation. *Garcia v. Posewitz*, 79 F.4th 874, 879 (7th Cir. 2023). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

Thus, a plaintiff has the burden to defeat qualified immunity "either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 723-24 (7th Cir. 2013). Here, plaintiff points to no analogous caselaw, nor has this court found a case, establishing that any of the defendants would or should have known that denying him a portable mirror while housed in a maximum security facility was a violation of his Eight Amendment rights, at least absent an unequivocal direction by a treating physician as to its being a medical necessity. (Dkt. #81, at 11-14.) Likewise, he does not demonstrate that defendants' decisions were so egregious under the circumstances that no

official in their position would have thought their actions lawful. Because plaintiff has not overcome defendants' entitlement to qualified immunity, summary judgment will be granted for this additional reason.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment (dkt. #55) is GRANTED.
2. The clerk's office is directed to enter judgment accordingly and to close this case.

Entered this 22nd day of September, 2026.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge